UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DR. TERI ALBRIGHT | § | |
| DR. MILTON SHAW | § | |
| MAX FOWLER | § | |
| PAULA FOWLER | § | |
| TRINITY EDWARDS SPRINGS | § | |
| PROTECTION ASSOCIATION | § | |
| Plaintiffs | § | |
| | § | CAUSE NUMBER:  1:20-cv-00651 |
| v. | § | |
| | § | |
| PERMIAN HIGHWAY PIPELINE LLC | § | |
| and KINDER MORGAN TEXAS | § | |
| PIPELINE LLC, | § | |
| Defendants | § | |

**PLAINTIFFS' ORIGINAL COMPLAINT**

**INTRODUCTION**

Earth Without Water

Imagine earth without water. The soil, with no water in it and nothing growing on it, would be lifeless, dead, collapsed into dust, sand, clay or rock….

Now imagine the air without water. Clouds provide a buffer from the heating power of the sun. Without them it would pour down with no mercy…. There would be no sweet scents, since moisture is what conveys smells….

If, instead of commanding it, we could conceive of ourselves as a partner or an intelligent component of water's own rain and storage cycle, it might encourage us to be more respectful of what water can do and more careful of the way we utilize it.

With water, we thrive. Without water, there is no life. We must learn to value, conserve, and take care of the water we have.[1]

---

[1] https://owlcation.com/stem/The-Importance-of-Water-to-Life

## NATURE OF THE CASE

1.      Defendants pumped 36,000 gallons of drilling fluid containing at least seven different

Class 1 probable human carcinogens into the aquifer near Blanco, Texas.

2.      Defendants have not cleaned up the contamination.

3.      There is no safe level of exposure to human carcinogens.

4.      Contaminating the aquifer on which people depend for water along the Blanco River Valley

is not acceptable to the conscience of the community or the law.

5.      This case is brought against Defendants for alleged violation of the federal Safe Drinking

Water Act, 42 U.S.C. §§ 300h to 300h–8, which protects "underground sources of drinking

water."

6.      The Safe Drinking Water Act prohibits the injection of "contaminants" into the

"underground sources of drinking water."

7.      "Contaminant" means any physical, chemical, biological, or radiological substance or

matter in water. 42 U.S.C. § 300f(6).

8.      On March 28, 2020, workers attempting to drill under the Blanco River made serious errors

and as a consequence pumped 36,000 gallons of "AMC Gel" drilling fluid in the aquifer.

9.      The plume of drilling fluid moved away from the drilling site under the river and

contaminated home water wells a mile to mile and a half away ruining the drinking water of Dr.

Teri Albright, Dr. Milton Shaw, Max and Paula Fowler, and others.

10.     The AMC Gel Safety Data Sheet from the manufacturer of the product is attached. See,

Exhibit 1

11.     The Safety Data Sheet for AMC Gel drilling fluid states it contains two Class 1 human

carcinogens, Acrylamide and Silica,  which were injected into the aquifer, which is an

"underground source of drinking water," which supplies water to Plaintiffs' homes, as well as area public water supplies.

12.      Later testing of this AMC Gel product by the lab at the Lower Colorado River Authority found this material contained numerous undisclosed noxious metals, several of which also are probable human carcinogens.

13.      Once providing pristine water, among the best in the State of Texas, Plaintiffs' home water wells remain cloudy months later from the injection of drilling fluid.

14.      Defendants have made no effort to clean up the pollution they created.

15.      The Defendants have not delineated the size of the plume or all areas impacted by the plume.

16.      The plume remains in the aquifer.

17.      The plume presents a continuing danger of contamination to this underground source of drinking water upon which 10,000 people depend.

18.      This case is brought by homeowners for damages for violations of the federal Safe Drinking Water Act, as well as Texas state law causes of action.

19.      Further, plaintiff TESPA seeks forward-looking injunctive protections on a broader scale to protect the aquifer, which is an "underground source of drinking water," which is supposed to be strictly protected, before it suffers more and greater irreparable damage.

## PLAINTIFFS

20.      Plaintiff, Dr. Teri Albright, is a resident of Blanco County, Texas.  Dr. Albright owns property with a drinking water well, owns the groundwater under her property, and is a member of TESPA.

21.     Plaintiff, Dr. Milton Shaw, is a resident of Blanco County, Texas. Dr. Shaw owns property with a drinking water well, owns the groundwater under his property, and is a member of TESPA.

22.     Plaintiff, Max Fowler, is a resident of Blanco County, Texas. Mr. Fowler owns property with a drinking water well, owns the groundwater under his property, and is a member of TESPA.

23.     Plaintiff, Paula Fowler, is a resident of Blanco County, Texas. Ms. Fowler owns property with a drinking water well, owns the groundwater under her property, and is a member of TESPA.

24.     Plaintiff, Trinity Edwards Springs Protection Association is a Texas non-profit with its principal place of business in Hays County, Texas. TESPA has members in Blanco and Hays counties with drinking water wells, and ownership of their groundwater.

## DEFENDANTS

25.     Defendant, Permian Highway Pipeline, LLC is a Delaware corporation with its principal place of business in Houston, Harris County, Texas.  It may be served through its registered agent for service of process:  Capital Corporate Services, Inc., 206 E. 9th Street, Suite 1300, Austin, Texas 78701-4411.

26.     Defendant, Kinder Morgan Texas Pipeline, LLC is a Delaware corporation with its principal place of business in Houston, Harris County, Texas.  Kinder Morgan is the managing partner of the Permian Highway Pipeline project.  It may be served through its registered agent for service of process:  Capital Corporate Services, Inc., 206 E. 9th Street, Suite 1300, Austin, Texas 78701-4411.

## VENUE

27.     The events giving rise to this action occurred in Blanco County, Texas, which is in the Austin Division of the Western District of Texas.  Therefore, venue is proper in this court pursuant to  28 U.S.C. § 1391.

## PERSONAL JURISDICTION
## OUT OF STATE INCORPORATED DEFENDANTS

28.     The Court has specific jurisdiction as the events made the basis of this action occurred in Blanco County, Texas, which is this division, and general jurisdiction as the corporations have their principal places of business in this state.  *See, Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco County*, --- U.S.---, 137 S. Ct. 1773, 1779–80, 198 L. Ed. 2d 395, 2017 WL 2621322 (2017).

## SUBJECT MATTER JURISDICTION

29.     This Court has original jurisdiction over this matter brought pursuant to the federal Safe Drinking Water Act, 42 U.S.C. §§ 300h to 300h–8.

30.     Plaintiffs bring this action pursuant to the federal Safe Drinking Water Act, "SDWA" which allows for enforcement through a "citizen suit" such as this case and provides the basis for federal question jurisdiction. 42 U.S.C. § 300j-8.

31.     "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331.

32.     Plaintiffs have issued the necessary citizen suit notices of intent to sue and have waited more than sixty days to file this litigation as required by 42 U.S.C. § 300j-8(b)(1)(A).  Exhibit 2.

33.     This Court has jurisdiction to grant declaratory relief concerning violations of the Safe Drinking Water Act pursuant to 28 U.S.C. §§ 2201 and 2202 of the Declaratory Judgment Act.

34.     This Court has supplemental jurisdiction of the state law causes of action as they arise out of the same event. 28 U.S.C. § 1367(a).

## FACTS APPLICABLE TO ALL CAUSES OF ACTION

35.     Kinder Morgan Texas Pipeline, LLC and Permian Highway Pipeline, LLC, hereafter "Kinder Morgan," are constructing a 42-inch diameter, 430-mile long, high pressure major natural gas transmission pipeline, typically called the "Permian Highway Pipeline" or "PHP," through the Central Texas Hill Country.

36.     This pipeline is one of the largest natural gas transmission pipelines in the entire State of Texas.

37.     The pipeline route in Blanco County seeks to cross the Blanco River at two locations.

38.     At these two river crossing locations, Defendants planned to use horizontal directional drilling ("HDD") to drill under the river to avoid the need for an open cut on the surface.

39.     Boring under a river, rather than open cutting across the surface, is often undertaken in the pipeline industry in an attempt to avoid additional regulatory oversight and Clean Water Act permits required from the United States Army Corps of Engineers.[2]

40.     The site of this discharge is the "disappearing" stretch of Blanco River at a location where the river water drains into the aquifer.

41.     This water flows into the aquifer and then later moves back above surface into the Blanco River.

42.     The location of this injection of drilling fluid under the Blanco River and adjacent aquifer is part of the Edwards Aquifer Contributing/Drainage Zone.[3]

43.     This area is unique in the State of Texas due to the pristine water that permeates this karst region.

---

[2] Plaintiffs do not agree with this interpretation of the Clean Water Act.
[3] https://www.edwardsaquifer.org/eaa/history/jurisdiction/

"A Karst Aquifer

The Edwards Aquifer's geological structure is that of limestone karst. In particular, it consists of Edwards limestone. This highly permeable limestone means that large amounts of water can be held within the aquifer. In addition to permeability, there are several faults. Water going into the aquifer will find its way into the crevices, which dissolves the limestone. To understand this, sand aquifers are permeable, but have small pores for water to enter. Aquifers made of limestone, such as the Edwards Aquifer, have larger pores for water to go through and remain. Water often makes these limestone pores even larger, creating more room for the storage of subterranean water.[4]

Source of Drinking Water
The Edwards Aquifer is not just a source for rivers and springs, it is an important source of drinking water for the people living in the area where the aquifer lies.  The state of Texas is home to 3 of the USA's top ten largest cities. One of those cities is San Antonio, home to 1,492,510 people. Located near San Antonio is the capital of Texas, Austin. The city of Austin has a population of 947,890 people. At least 2 million people depend on the Edwards Aquifer for their water supply. At one time, the Edwards Aquifer was the only source of water that San Antonio received its drinking water. The aquifer continues to be a source of drinking water for millions of people in Central Texas.[5]"

- The World Atlas, What is the Edwards Aquifer?

44.     As of 2019, the Texas Railroad Commission reports that 469,737[6] miles of pipeline are in operation in Texas.

45.     This pipeline is the largest constructed to date in this state at 42" diameter and moving over 2+ billion cubic feet and millions of dollars of value of gas a day.

46.     Defendants decided to be the first to build a major pipeline where others would not and moved forward aggressively as the first to put in a major transmission pipeline through this geologically sensitive karst area of pristine waters of the Blanco River Valley between Blanco to Wimberley to Kyle, Texas.[7]

[4] https://www.worldatlas.com/articles/what-is-the-edwards-aquifer.html

[5] https://www.worldatlas.com/articles/what-is-the-edwards-aquifer.html

[6] https://www.rrc.state.tx.us/pipeline-safety/reports/texas-pipeline-system-mileage/

[7] https://rrc.texas.gov/about-us/resource-center/research/gis-viewers/

47.     On March 31, 2020, Dr. Teri Albright turned on her kitchen sink and the water went from previously crystal clear to mud color. Then, the same happened to the nearby Fowler's home water.

48.     Others in this same area have been impacted.

49.     The size of the drilling fluid plume is unknown at this time.

50.     Kinder Morgan has acknowledged the milky discharge in the water at the Albright/Shaw's home and Fowler's home is from the drilling fluid from their boring activity.

51.     The homeowners reported the cloudy/milky discharge in the water left a greasy film on the kitchen sink and their skin, which persisted even using soap and scrubbing.

52.     The contamination persists in the aquifer at this time.

53.     Defendants explained the event in a statement to the Texas Railroad Commission as follows.

> "*On Saturday, March 28, Permian Highway Pipeline (PHP) experienced an underground drilling fluid loss during construction in Blanco County, Texas. The drilling fluid is comprised of bentonite clay and water. Bentonite is a naturally occurring, non-hazardous, non-toxic clay. We strive for zero incidents and minimal operations have been suspended while the team evaluates the cause of the loss and determines the best path forward. We are working with affected landowners to address their needs. We are also consulting with our karst expert and the local water district manager to determine the best way to mitigate any current and future impacts. All of the appropriate regulatory agencies have been notified.*"

54.     In their statement to the Texas Railroad Commission and public press releases, Defendants concealed the whole truth about what they injected into the aquifer.

## THE DRILLING FLUID – AN ADMITTED HUMAN CARCINOGEN

55.     The workers were using a drilling fluid product called "AMC Gel."

56.     The AMC Gel Safety Data Sheet in Section 11, Toxicological Information, expressly states: "*On the basis of epidemiological data, the material is regarded as carcinogenic to humans. There is sufficient data to establish a causal association between human exposure to the material and the development of cancer.*"  See, Exhibit 1 (emphasis added).

57.     This statement in the Safety Data Sheet appears to be based on two additives, Acrylamide and Silica.

58.     "The International Agency for Research on Cancer (IARC) classifies acrylamide as a **"probable human carcinogen." (emphasis in original).** The National Cancer Institute explains: The National Toxicology Program's Report on Carcinogens considers acrylamide to be reasonably anticipated to be a human carcinogen, based on studies in laboratory animals given acrylamide in drinking water. However, toxicology studies have shown that humans and rodents not only absorb acrylamide at different rates, they metabolize it differently as well."[8]

59.      Silica is an additive in the mix and the International Agency for Research on Cancer, commonly known as "IARC", creator of the classification system, classifies silica as a Class 1, human carcinogen.[9]

60.     Bentonite, apparently the major constituent component of the AMC Gel, is not a benign, inert material as Kinder Morgan portrayed in the public media.  Attached to the Notice of Intent as just a recent example is a study of Bentonite by *Masoudi, et al.*, Journal of Toxicology & Industrial Health, Vol. 36, Issue 1, Feb. 25, 2020.

[8] https://www.cancer.gov/about-cancer/causes-prevention/risk/diet/acrylamide-fact-sheet

[9] https://monographs.iarc.fr/wp-content/uploads/2018/06/mono100C-14.pdf

## THE LCRA TEST RESULTS OF AMC GEL

61.     Further, Defendants made a sample of the AMC Gel available to Plaintiffs for testing.

62.     Kinder Morgan made some AMC Gel available to Plaintiffs' consultants for testing, which was sent to the Lower Colorado River Authority, hereafter "LCRA," lab for testing.

63.     The LCRA is well respected and widely used by water quality professionals, water districts, and regular citizens to test water quality.

64.     LCRA's test results received on June 18, 2020, on the sample of AMC Gel diluted to approximate the concentration of mix in the drilling fluid as it would be at the release point from the drill bit found the following metals present in the AMC Gel sample:

        Aluminum  146 mg/L
        Arsenic 0.0484 mg/L
        Barium 10.3 mg/L
        Beryllium  0.0472 mg/L
        Cadmium  0.00155 mg/L
        Chromium  0.0604 mg/L
        Copper 0.240 mg/L
        Lead 0.0986 mg/L
        Manganese 3.07 mg/L
        Nickel 0.0460 mg/L
        Selenium <0.00500 mg/L
        Silver <0.00100 mg/L
        Thallium 0.00198 mg/L
        Zinc 0.197 mg/L

65.     The following materials found in the AMC Gel, but not disclosed on the Safety Data Sheet or Kinder Morgan's statements to the public and enforcement agencies, also are human carcinogens as determined by IARC, the foremost recognized authority on cancer research in the world.

66. Arsenic is a Group 1/Class 1 probable human carcinogen.[10]

---

[10] https://www.cancer.org/cancer/cancer-causes/general-info/known-and-probable-human-carcinogens.html

67. Beryllium is a Group 1/Class 1 probable human carcinogen.[11]

68. Chromium VI such as hexavalent chromium is Group 1/Class 1 probable human carcinogen.[12] The specific form of the chromium in the AMC Gel was not identified by LCRA in its test result.

69. Nickel is a Group 1 probable human carcinogen.[13]

70. **Arsenic is identified in recent research by Evans, et al., as one of the most guilty culprits in 100,000 or more cancers annually due to drinking water, which meets EPA drinking water standards**.[14]   Here, the Arsenic as measured at the point of release/injection into the aquifer was approximately 4x the EPA drinking water standards.  Evans and co-authors concluded, "Overall, state- and national-level cumulative cancer risks due to carcinogenic water contaminants are similar in magnitude to the risks reported for carcinogenic air pollutants. Thus, improving water quality at the tap and investing in measures for source water protections represent opportunities for protecting public health and decreasing potential disease incidence due to environmental pollution."

## NO SAFE LEVEL OF EXPOSURE TO CARCINOGENS

71.    There is no safe level of exposure to a carcinogen.

[11] https://www.cancer.org/cancer/cancer-causes/general-info/known-and-probable-human-carcinogens.html

[12] https://www.cancer.org/cancer/cancer-causes/general-info/known-and-probable-human-carcinogens.html

[13] https://www.cancer.org/cancer/cancer-causes/general-info/known-and-probable-human-carcinogens.html

[14] https://www.cell.com/heliyon/pdf/S2405-8440(19)35974-2.pdf?_returnURL=https%3A%2F%2Flinkinghub.elsevier.com%2Fretrieve%2Fpii%2FS2405840 4019359742%3Fshowall%3Dtrue

72. Former Assistant Surgeon General of the United States Richard Lemen has testified:

> Lemen testified:
> Q: And isn't it true that this principle that we don't know of any safe level of exposure is true for any carcinogen?
> A: At the present time, we aren't able to identify the carcinogenic compounds, what is safe and what is not safe. And that is true pretty much across the board for things that cause cancer.
> Q: So for anything on this list of carcinogens that we'll talk about later, your answer is true that if it is on the list of carcinogens, it's not just asbestos, it's the entire list that you would say we know of no safe level of exposure to it, correct?
> A: Basically that's correct.
> Q: Even if it's used even today day-in and day-out in industrial and consumer products?
> A: That's correct....

*Bostic v. Georgia-Pac. Corp.,* 439 S.W.3d 332, 340 (Tex. 2014)(fn. 28), *see also, Bonnette v. Conoco, Inc.,* 837 So. 2d 1219, 1232 (La. 2003).

73.    The *Bostic* court was analyzing a different issue than presented here, and which is not in issue in this case, which exposures to a carcinogen in personal injury case could be held to be a "substantial factor" in causation of a plaintiff's cancer, where he was exposed to numerous different asbestos-containing products.  This case does not present personal injury claims or similar product liability causation issues.

74.    ***The Supreme Court of Arkansas specifically held related to exposures to Arsenic, "With reference to general causation, arsenic is a potent cancer promoter in adults and a complete carcinogen in the fetus (Waalkes 2004). There is no safe level of exposure to a carcinogen.*** The difference between a low dose of arsenic and a high dose is the amount of cancer it causes in the exposed population. The acute short-term exposure to arsenic overwhelms the body's defense systems and there is resulting injury to the body. The arsenic leaves the body but only after the damage is done."

*Green v. Alpharma, Inc*., 373 Ark. 378, 391, 284 S.W.3d 29, 39 (2008)(emphasis added).

75.     "And as far as I know, there is no safe level of exposure to a carcinogen. What we do with our quantitative risk activity is try to define the level which we consider to carry with it a so-called acceptable level of risk, is a very low risk; but I don't know of any-well, any evidence that there is a threshold for cancer effects. So then the answer to your question is that any exposure is going to increase the risk. The higher the exposure, the higher the risk...." *Beck v. Koppers, Inc.*, 3:03 CV 60 P D, 2006 WL 270260, at \*8 (N.D. Miss. Feb. 2, 2006)

76.     Best management practices in public health, industrial hygiene, and general medicine emphasize that a person's exposure to carcinogens should be kept "***as low as reasonably attainable***," also known as "***ALARA***," or also termed "***at the lowest as technologically feasible level***."

77.     The Supreme Court of the United States has confirmed this best management practice is OSHA's Cancer Policy. ***"Wherever the toxic material to be regulated is a carcinogen, the Secretary has taken the position that no safe exposure level can be determined and that § 6(b)(5) requires him to set an exposure limit at the lowest technologically feasible level that will not impair the viability of the industries regulated."*** *Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 613, 100 S. Ct. 2844, 2849, 65 L. Ed. 2d 1010 (1980)(emphasis added).

78.     There was no amount of this drilling fluid that was or is permited to be discharged into this underground source of drinking water.

79.     There are methods of boring that are called "dry boring," which do not need to use products such as this AMC Gel.

80.     Thus, exposure at "***lowest technologically feasible level that will not impair the viability of the industries regulated***" is zero for the use of this product in the Blanco to Wimberley to Kyle

segment of this pipeline as there are acceptable alternatives that can be utilized without the use of this product.

81.     Prior to Defendants the contamination event, plaintiff homeowners drank water from this aquifer from their water wells without treatment as it was excellent quality.

82.     In addition to the impacted homeowners, this action is brought in the public interest to pursue  exactly what is recommended in the Evans study above.  This action seeks to protect source water through enforcement of the SDWA for the past violation, and to seek forward-looking protection through enjoining the use of this and other similar carcinogenic drilling fluid materials in areas in which there is potential for it to contaminate sources of drinking water.

**THE BORING EVENT GONE WRONG**

83.     The Defendants injected the drilling fluid while attempting to bore a pathway for their pipeline under the Blanco River.

84.     The Blanco River does not have a impervious "bottom" at this location.

85.     The water in the Blanco River in this area flows from the surface below ground through porous rock, cracks, faults, fissures, and voids out into the aquifer. Hence, this area is known as the "disappearing segment" of the Blanco River.

86.     In horizontal directional drilling, "HDD," a comparatively small pilot hole is drilled underground at a shallow angle of attack and comes back to the surface hundreds of yards, or more, away.

87.     Then, progressively larger boring tools are used in multiple passes back and forth over the several hundred yards to ream open the diameter of the bore until the opening is sufficiently wide to accommodate the 42" diameter high pressure pipeline Defendants sought to install in the hole

bored under the river.  Just to be very clear, it goes from surface, below ground below the river, then back upward to the surface on the opposite side.

88.     The HDD equipment looks somewhat similar to a small oil drilling rig turned on its side at an angle.

89.     This HDD bore hole meets the definition of a "**well**", which is defined as: "***Well means***: A bored, drilled, or driven shaft whose depth is greater than the largest surface dimension; or, a dug hole whose depth is greater than the largest surface dimension; or, an improved sinkhole; or, a subsurface fluid distribution system." 40 C.F.R. § 144.3

90.     If allowed to proceed to bore under this river, the danger to the water is present with each pass of which there would be multiple passes to ream the hole out to sufficiently large diameter to fit the 42" diameter pipeline.

91.     The HDD works similar to an oil drilling rig pumping drilling fluid, also often called "mud," under pressure to pass through the interior of the drill pipe and out the front end through the drill bit which cuts the pathway.

92.     The fluid then is supposed to pass between the exterior of the drill bit and pipe along the wall of the bore back to the surface where it carries the cuttings back to the surface.

93.     Here is a graphic illustrating the general pattern of the flow of drilling fluid and illustrating how it flows back towards the surface against the bore wall, the karst in this area.



94.     Without the sufficient wall strength or resistance in this karst zone to contain the drilling

fluid, the HDD method here failed to contain the fluid pumped out of the drill bit.

95.     Thus, the drilling fluid flowed into the soft surrounding structure of the karst permeated with water into a near surface layer of water of the aquifer, which then flowed to the Plaintiffs' home water wells within the next few days.

96.     The Albright/Shaw and Fowler water wells are approximately one mile to one a half miles away from the release point of the drilling fluid.

97.     The act of boring/drilling under the Blanco River was the proximate cause of the injection of 36,000 gallons of drilling fluid into the aquifer, which contaminated the water which supplied the Plaintiffs' homes with drinking water.

98.     There was no authorization, and could be no authorization, to permit the Defendants' injection of this drilling fluid into this "Underground Source of Drinking Water."

99.     The drillers who normally work in this area drill water wells, which similarly are shallow and go into this water filled karst.  They know that the karst will make drilling fluid/mud difficult to impossible to contain, so they do not use any drilling fluid such as AMC Gel in drilling in this area.

100.    Drillers drilling a water well in this area use plain water and a food grade surfactant safe for human ingestion.

101.    Rather than seeking out drillers familiar with "best management practices" to protect the waters in this area, Defendants proceeded as if they were drilling in West Texas or South Texas, which do not have this karst hydrogeology.

102.    What remains unknown is why when the drilling operation lost fluid pressure, they continued to pump more and more and more drilling fluid into the aquifer until they had pumped 36,000 gallons by their own self-reported account.

103.    Such acts constitute the failure to exercise ordinary care that a reasonably prudent person in the same or similar circumstances would have exercised.

104.    Such failure was a proximate cause of the injection of 36,000 gallons of drilling fluid into the underground source of drinking water, and the plume impacting and destroying the previously high quality water at the homes.

105.    Water from the faucets at the Albright home on March 31, 2020:



106.

107.    Water from the faucets at the Fowler Home in April 2020:



108.    Water from the well at the Albright Home on June 14, 2020, shows that the contaminants remain in the aquifer.



109.    The size or exact location of the underground plume of contaminated aquifer has not been delineated at this time.

*110.    **All facts are incorporated by reference into each cause of action.***

111.    All causes of action are pled cumulatively and also in the alternative.

112.    Plaintiffs reserve their right to an election of remedies.

## CAUSE OF ACTION 1
## ALL PLAINTIFFS
## SAFE DRINKING WATER ACT
## UNAUTHORIZED INJECTION OF CONTAMINANTS
## INTO "UNDERGROUND SOURCES OF DRINKING WATER"

113.     The SDWA was enacted to protect the nation's drinking water by regulating public water supply systems to ensure they meet minimum national standards to protect public health. 42 U.S.C. §§ 300f *et seq*.

114.     The purpose of the SDWA also specifically is to prevent underground injection which endangers underground sources of drinking water.  The EPA has prepared a helpful overview summary of the SDWA.[15]

115.     This Court has jurisdiction to grant declaratory relief concerning violations of the Safe Drinking Water Act pursuant to 28 U.S.C. §§ 2201 and 2202, of the Declaratory Judgment Act.

116.     Plaintiffs seek a determination that Defendants through their agents violated the SDWA due to injecting 36,000 gallons drilling fluid, which are "contaminants," into an "underground source of drinking water" without authorization or a permit.

117.     This contaminant, the drilling fluid, may pose health risks to humans and underground sources of drinking water as there are at least seven different probable human carcinogens in this mixture and there is no safe level of exposure to carcinogens.

118.     Part C of the SDWA, 42 U.S.C. § 300h-300h-8, created the Underground Injection Control ("UIC") program, which is overseen by the EPA and may be implemented in part by the states, who can create their own UIC program subject to EPA approval.

---

[15] https://www.epa.gov/sites/production/files/2015-04/documents/epa816f04030.pdf

119.    The UIC program protects potential and actual underground sources of drinking water from contamination by underground injection wells. *See* H.R. Rep. No. 1185, 93rd Cong., 2d Sess. (1974), reprinted in 1974 U.S. Code Cong. & Admin. News, pp. 6454, 6480 (UIC program is intended "to assure that drinking water sources, actual and potential, are not rendered unfit for such use by underground injection of contaminants.").

120.    The federal UIC program requires all States to submit a UIC program to EPA for approval. 40 C.F.R. 144.1(e).

121.    Once a state program is established, the SDWA provides that all underground injections are unlawful and subject to penalties unless authorized by a permit or rule. 40 C.F.R. § 144.1(e).

122.    "Any underground injection, except into a well authorized by rule or except as authorized by permit issued under the UIC program is prohibited. The construction of any well required to have a permit is prohibited until the permit has been issued." 40 C.F.R. § 144.11 (entitled Prohibition of Unauthorized Injection).

123.    EPA has classified five types of underground injection wells that may be permitted. 40 C.F.R. 144.6.

124.    A horizontal drilling borehole for pipeline installation under a river is not among the types of UIC wells that can be authorized to inject fluids into the aquifer as Defendants did.

125.    The SDWA prohibition is clear: "No owner or operator shall construct, operate, maintain, convert, plug, abandon, or conduct any other injection activity in a manner that allows the movement of fluid containing any contaminant into underground sources of drinking water, if the presence of that contaminant may cause a violation of any primary drinking water regulation under 40 CFR part 142 or may otherwise adversely affect the health of persons." 40 C.F.R. § 144.12(a).

126.    "Contaminant" means any physical, chemical, biological, or radiological substance or matter in water. 42 U.S.C. § 300f(6).

127.    Defendants engaged in underground injection, which "means the subsurface emplacement of fluids by well injection." 42 U.S.C. § 300h(d)(1)(A).

128.    40 C.F.R. § 144.3 provides definitions, several of which are provided here for ease of reference.

Aquifer means a geological "formation," group of formations, or part of a formation that is capable of yielding a significant amount of water to a well or spring.

Drilling mud means a heavy suspension used in drilling an "injection well," introduced down the drill pipe and through the drill bit.

Formation fluid means "fluid" present in a "formation" under natural conditions as opposed to introduced fluids, such as "drilling mud."

Ground water means water below the land surface in a zone of saturation.

Injection well means a "well" into which "fluids" are being injected.

Injection zone means a geological "formation" group of formations, or part of a formation receiving fluids through a "well."

Permit means an authorization, license, or equivalent control document issued by EPA or an approved State to implement the requirements of this part, parts 145, 146 and 124. "Permit" includes an area permit (§ 144.33) and an emergency permit (§ 144.34). Permit does not include UIC authorization by rule (§ 144.21), or any permit which has not yet been the subject of final agency action, such as a "draft permit."

Underground injection means a "well injection."

Underground source of drinking water (USDW) means an aquifer or its portion:

(a) (1) Which supplies any public water system; or

(2) Which contains a sufficient quantity of ground water to supply a public water system; and
(i) Currently supplies drinking water for human consumption; or
(ii) Contains fewer than 10,000 mg/l total dissolved solids; and

(b) Which is not an exempted aquifer.

USDW means "underground source of drinking water."

Well means: A bored, drilled, or driven shaft whose depth is greater than the largest surface dimension; or, a dug hole whose depth is greater than the largest surface dimension; or, an improved sinkhole; or, a subsurface fluid distribution system.

Well injection means the subsurface emplacement of fluids through a well.

129.    Defendants' activity does not fall within the defined narrow exclusion to the definition of underground injection. 42 U.S.C. § 300h(d)(1)(B).

130.    Defendants injected contaminants into the Glen Rose, Hensell, and/or Cow Creek formations of the Trinity aquifer.

131.    Homeowner plaintiffs drinking water wells most likely draw from Cow Creek formation of the Trinity aquifer which is an "underground source of drinking water" as defined by the Safe Drinking Water Act program.

132.    Many other private drinking water wells and public water supply wells draw from Glen Rose, Hensell, and/or Cow Creek formations of the Trinity aquifer.   This injection of drilling fluid occurred just to the west (left) of the Blanco/Hays County line on the graphic below illustrating a cross-section of the aquifer in this area.



133.    The location of Defendants' injection and homeowner plaintiffs' wells is in a highly karstic area riddled with near surface faults, voids and other permeable pathways which allowed the injected contaminants to be forced out of the borehole, into the aquifer, and to the drinking water wells.

134.    The EPA has not approved any exempted aquifers or portions of exempted aquifers in Blanco or Hays counties pursuant to the procedures set forth in 40 C.F.R. § 144.7.

135.    The EPA has not exempted the Glen Rose, Hensell, and/or Cow Creek formations of the Trinity aquifer or any portions of these aquifers pursuant to the procedures set forth in 40 C.F.R. § 144.7.

136.    To the contrary, the location of this illegal underground injection of drilling fluid into the Blanco River and adjacent aquifer is part of the Edwards Aquifer Contributing/Drainage Zone.[16]

137.    This area is unique in the State of Texas due to the pristine water that permeates this karst region.

---

[16] https://www.edwardsaquifer.org/eaa/history/jurisdiction/

138.     There was no authorization, and could be no authorization, to permit the Defendants' injection of this drilling fluid into this "Underground Source of Drinking Water."

139.     Such failure was a proximate cause of the injection of 36,000 gallons of drilling fluid into the underground source of drinking water, and the plume impacting and destroying the pristine quality water at the homes.

140.     Defendants conducted underground injection activity within the meaning of the SDWA.

141.     Defendants injected drilling fluids containing contaminants, namely AMC Gel, which contains acrylamide, silica, bentonite, arsenic, lead, and other carcinogens and contaminants through a well into an underground source of drinking water.

142.     Defendants injected contaminants into the aquifer forming a moving underground plume that may move further threaten to contaminate other drinking water wells.

143.     Defendants violated the SDWA which prohibits any unauthorized "injection activity in a manner that allows the movement of fluid containing any contaminant into underground sources of drinking water, which the presence of that contaminant may … adversely affect the health of persons." 42 U.S.C. § 300h(b)(1)(A).

144.     The violation of the SDWA is ongoing because the contaminants injected by the Defendants remain in the aquifer.

145.     Each day that the contaminants injected by the defendants remain in the aquifer is a new violation.

146.     The Defendants' violation of the SDWA presents an imminent and substantial endangerment to an underground source of drinking water upon which thousands of people rely as their sole source of drinking water.

**TEXAS STATE LAW**

**CAUSES OF ACTION**

**CAUSE OF ACTION 2 – NEGLIGENCE**

147.    All facts are incorporated by reference.

148.    It is axiomatic that "negligence" means failure to use ordinary care, that is, failing to do that which a person of ordinary prudence would have done under the same or similar circumstances or doing that which a person of ordinary prudence would not have done under the same or similar circumstances.

149.    The use of drilling fluid to bore under the Blanco River was the proximate cause of the injection of 36,000 gallons of drilling fluid into the aquifer, which supplied the Plaintiffs' homes with drinking water.

150.    The drillers who normally work in this area drilling shallow wells such as water wells know that the karst will make drilling fluid/mud difficult to impossible to contain, so they do not use any in drilling in this area.

151.    Drillers drilling a water well in this area use plain water and a food grade surfactant safe for human ingestion.

152.    In contrast, Defendants boldly decided to be the first to put in a major gas transmission pipeline through this geologically sensitive area of pristine waters.

153.    Rather than seeking out drillers familiar with "best management practices" to protect the waters in this area, Defendants acted like they were drilling an oil well, which are conspicuously absent from this area and in so doing, chose to use drilling fluid containing carcinogens and metals.

154.    What remains unknown is why when the driller lost fluid pressure, they continued to pump more and more and more drilling fluid into the aquifer until they had pumped 36,000 gallons by their own self-reported account.

155.    Such acts constitute the failure to exercise ordinary care that a reasonably prudent person in the same or similar circumstances would have exercised.

156.    Such failure was a proximate cause of the injection of 36,000 gallons of drilling fluid into the underground source of drinking water, and the plume impacting and destroying the water quality at the homes.

157.    As further evidence of what a reasonable person under the same or similar circumstances could and would do, after this event, Defendants have changed to using "dry" boring methods in the zone between Blanco to Wimberley to Kyle.

158.    So, a much less dangerous to water quality alternative was and is very feasible.

159.    Similarly, the City of Austin constructed a major underground pipeline to move water from Water Treatment Plan 4 on the banks of Lake Travis to connect into the City's water pipeline network approximately seven miles away.  The City of Austin was able to construct that pipeline in a highly karstic zone by going deeper below the geologic level with karst including several endangered species.  That boring project created an opening approximately 8' in diameter and seven miles long.  Such method used by the City of Austin did not result in drilling fluid being released or injected into the aquifer.[17]

---

[17] https://tunnelingonline.com/water-texas-challenges/

160.    Alternatively, another method known as the "direct pipe" method uses a cutter that contains essentially all fluids and pushes it back to the surface through the pipe which is pulled behind the cutter.18

161.    Thus, Defendants' decisions constitute negligence, which was a proximate cause of the event and the contamination of Plaintiffs' home water wells and the damages resulting from that contamination.

## CAUSE OF ACTION 3

## NEGLIGENCE AS A MATTER OF LAW – TEXAS LAW

162.    All facts are incorporated by reference.

163.    In this case, Defendants are negligent as a matter of law for violation of the Safe Drinking Water Act as already set forth.

164.    Defendants' project of building this major transmission pipeline undeniably is subject to regulation, rules, and standards set by the Texas Railroad Commission, among several local, state, and federal agencies.

165.    Further, and in the alternative, Defendants are negligent as a matter of law for violation of Texas Railroad Commission Rule 3.8(b), which provides: "(b) No pollution. No person conducting activities subject to regulation by the commission may cause or allow pollution of surface or subsurface water in the state." 16 Tex. Admin. Code 3.8.

166.    "Negligence per se is a tort concept whereby a legislatively imposed standard of conduct is adopted by the civil courts as defining the conduct of a reasonably prudent person." *Carter v. William Sommerville & Son, Inc.*, 584 S.W.2d 274, 278 (Tex. 1979). A plaintiff thereby establishes

---

18 https://www.youtube.com/watch?v=3FfYmOAHyms&t=299s

a breach of a legal duty based on a violation of a statute that was designed to prevent an injury to that class of persons to which the plaintiff belongs. *Id.*"  *Chavez Yanez v. WWGAF, Inc.*, SA-19-CV-01065-DAE, 2020 WL 2527941, at \*5 (W.D. Tex. May 18, 2020).

167.    "In a negligence per se case, the jury is not asked to determine if the defendant acted as a reasonably prudent person would have acted under the same or similar circumstances.  Instead, the statute itself provides what a reasonably prudent person would have done.  Unless an excuse for the statutory violation is offered, the jury decides only whether the statute was violated and, if so, whether the violation was a proximate cause of the injury."  *In re Associated Truss Co.*, 05-18-00896-CV, 2018 WL 6695739, at \*3 (Tex. App.—Dallas Dec. 20, 2018, no pet.).

168.    Texas Railroad Commission Rule 3.8 is designed to prevent the "injury" i.e. contamination of all water, but most certainly protects drinking water as among the most critical protections.

169.    Defendants' violation of this rule constitutes negligence as a matter of law, which was a proximate cause of the event and Plaintiffs' damages.

## CAUSE OF ACTION 4

## HOMEOWNERS ONLY

## TRESPASS – TEXAS LAW

170.    All facts alleged are incorporated by reference.

171.    The plume of drilling fluid injected by Defendants into the aquifer entered the groundwater below Plaintiffs' land without consent of the owner, which constitutes trespass as defined by Texas law.

172.    "[A] landowner has a right to exclude others from groundwater beneath his property…." *Edwards Aquifer Auth. v. Day,* 369 S.W.3d 814, 830 (Tex. 2012).

173.    "'Trespass' means an entry on the property of another without having consent of the owner. To constitute a trespass, entry upon another's property need not be in person but may be made by causing or permitting a thing to cross the boundary of the property below the surface of the earth. Every unauthorized entry upon property of another is a trespass, and the intent or motive prompting the trespass is immaterial." *FPL Farming Ltd. v. Envtl. Processing Sys., L.C.,* 383 S.W.3d 274, 282 (Tex. App.—Beaumont 2012), rev'd, 457 S.W.3d 414 (Tex. 2015)(approving this jury instruction by the trial court, but reversing on other grounds and not reaching substantive question on subterranean trespass in that case).

174.    If Defendants somehow argue they had a permit which authorized their conduct to inject the drilling fluid into the aquifer, which they do not and cannot, such permit does not constitute an excuse or justification authorizing the trespass onto Plaintiffs' land or the water beneath it.

175.    In the up and down appeals of *FPL Farming Ltd. v. Envtl. Processing Sys., L.C.*, the Supreme Court of Texas noted in its 2011 opinion:

> "As a general rule, a permit granted by an agency does not act to immunize the permit holder from civil tort liability from private parties for actions arising out of the use of the permit. This is because a permit is a "negative pronouncement" that "grants no affirmative rights to the permittee." *Magnolia Petroleum Co. v. R.R. Comm'n,* 141 Tex. 96, 170 S.W.2d 189, 191 (1943). A permit removes the government imposed barrier to the particular activity *311 requiring a permit. As the Amarillo Court of Appeals aptly stated: "[O]btaining a permit simply means that the government's concerns and interests, at the time, have been addressed; so, it, as a regulatory body, will not stop the applicant from proceeding under the conditions imposed, if any." *Berkley,* 282 S.W.3d at 243."

*FPL Farming Ltd. v. Envtl. Processing Sys., L.C.*, 351 S.W.3d 306, 310–11 (Tex. 2011).

176.    In the event PHP can somehow prove it had a permit for an injection well, it still is not relieved of the consequences of its conduct.   In a case of groundwater pollution resulting from injection well activity, the Supreme Court of Texas held:

> "…the Railroad Commission's determination of the propriety of the permit has no effect on the propriety of the permittee's potentially tortious actions…." "Of course, statutory remedies may

preempt common law actions or other standards that may set the bar for liability in tort, but a permit is not a get out of tort free card."

*FPL Farming Ltd. v. Envtl. Processing Sys., L.C.,* 351 S.W.3d 306, 311 (Tex. 2011)

177.    Indeed, even the Texas Water Code chapter regarding injection well permitting provides: "The fact that a person has a permit issued under this chapter does not relieve him from any civil liability."  Tex. Water Code § 27.104.

178.    Additionally, the Texas Administrative Code Section 305.122(c) governing TCEQ permits states that:  "The issuance of a permit does not authorize any injury to persons or property or an invasion of other property rights, or any infringement of state or local law or regulations."  *See also, FPL Farming Ltd. v. Envtl. Processing Sys., L.C.,* 351 S.W.3d 306, 312 (Tex. 2011).

179.    The trespass by Defendants' plume was and is a proximate cause of substantial damages to Plaintiffs' use and enjoyment of their home and land, as well as a financial injury to the value of their water property rights as recognized by Texas Water Code, chapter 36 and "the water estate" as recognized by the Supreme Court of Texas in *Day* similar to a "mineral estate."

## CAUSE OF ACTION 5

## HOMEOWNERS' ONLY

## NUISANCE – TEXAS LAW

180.    All facts alleged are incorporated by reference.

181.    "A 'nuisance' is a condition that substantially interferes with the use and enjoyment of land by causing unreasonable discomfort or annoyance to persons of ordinary sensibilities attempting to use and enjoy it,…" *Holubec v. Brandenberger*, 111 S.W.3d 32, 37 (Tex. 2003).  *See also*, *Yuen v. Triple B Services LLP,* CV H-18-3277, 2019 WL 3069791, at *8 (S.D. Tex. July 8, 2019), report

and recommendation adopted sub nom., *Yuen v. Triple B Services, LLP*, 4:18-CV-3277, 2019 WL 3388321 (S.D. Tex. July 26, 2019).

182.    Defendants' plume of drilling fluid containing human carcinogens deprived the Plaintiffs for many weeks of any usable source of water other than bottles of water to drink, bathe, and cook. Now, Plaintiffs are installing rainwater collection systems and trucking in freshwater, which is dependent on the rainfall of Texas, which is unpredictable at best, or the expense of trucking in bulk potable water at $0.10/gallon.

183.    Thus, Defendants' plume of drilling fluid in the aquifer contaminating Plaintiffs' water wells constitutes a nuisance and must be remedied through injunctive relief by the Court ordering Defendants to clean up the pollution in such a manner that the well water becomes usable again, and will remain usable, not subject to the plume moving back every time a new major rain event moves water below the Plaintiffs' wells.

## CAUSE OF ACTION 6

## TESPA ONLY – INJUNCTIVE RELIEF SOUGHT

## PUBLIC NUISANCE

184.    All facts, and the laws underlaying the other causes of action, are incorporated by reference for the Court's consideration of this cause of action to enjoin a "public nuisance" created by Defendants.

185.    The plume of drilling fluid remaining in the aquifer uncontained and unremediated is like a pack of vicious dogs roaming about and the only question is who will they attack next?

186.    This unrestrained plume, the cocktail of carcinogens, drifting aimlessly about, constitutes a "public nuisance."  TESPA seeks injunctive relief from the Court to remedy the public nuisance.

187.    What constitutes a public nuisance is widely varying as is the relief afforded to remedy it.

A public nuisance is a condition amounting to "an unreasonable interference with a right common to the general public." *Cox v. City of Dallas*, 256 F.3d 281, 289 (5th Cir. 2001) (citing Restatement (Second) of Torts § 821B(1) (1979)); *see also Jamail v. Stoneledge Condo. Owners Ass'n*, 970 S.W.2d 673, 676 (Tex. Civ. App–Austin 1998, no pet.). Unreasonable interference may involve: (1) conduct that significantly interferes with "the public health, the public safety, the public peace, the public comfort or the public convenience," (2) conduct that "is proscribed by a statute, ordinance or administrative regulation," or (3) conduct that is continuing or "produced a permanent or long-lasting effect, and, as the actor knows or has reason to know, has a significant effect upon the public right." Restatement (Second) of Torts § 821B(2)(a)–(c) (1979); *see also Cox*, 256 F.3d at 289. Two remedies available for public nuisance actions are damages and injunctions. *Cox*, 256 F.3d at 291. Public nuisance claims are traditionally derived from common law, which was later supplanted by statutorily defined public nuisances. Restatement (Second) of Torts §§ 821B(b)–(c). Actions based on public rights derived from common law are likely governed by state law even when adjudicated by federal courts. *See City of Philadelphia v. Beretta U.S.A. Corp.*, 277 F.3d 415, 421 (3d Cir. 2002) ("[P]ublic nuisance is a matter of state law, and it is not the role of a federal court to expand state law."); *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) ("Except in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state ... There is no federal general common law.").

\*10 In order to have standing to enjoin a public nuisance, the plaintiff must either: (1) have the right to recover damages (2) have authority as a public official or public agency representing the state or apolitical subdivision, or ***(3) have "standing to sue as a representative of the general public, as a citizen in a citizen's action."*** Restatement (Second) of Torts § 821C (1979).

*Friends of Lydia Ann Channel v. Lydia Ann Channel Moorings, LLC*, 2:19-CV-00148, 2020 WL 1434706, at \*9–10 (S.D. Tex. Mar. 24, 2020)(Judge Jack, presiding)(emphasis added).

## ADDITIONAL PLEADING

## ON THE STANDING OF TESPA

188.    TESPA has "associational standing" to bring this action.

189.    Supplemental pleading is provided here to demonstrate the "associational standing" of

Plaintiff TESPA.

190.    TESPA has members directly impacted by the water pollution made the basis of this action

Dr. Albright, Dr. Shaw, the Fowlers, and Mary Harris, who are members of TESPA and who seek

damages in this action for the pollution of their home water supply due to actions of the

Defendants.  TESPA does not seek damages for them.  However, TESPA also has members in the area not yet impacted by the plume, but who are risk for the plume spreading to their water wells and it may move to public water supply intakes and contaminate springs and Hill Country waters.

191.    TESPA seeks injunctive relief mandating containment and remediation of the plume to protect these members, as well other members down gradient, as Defendants have made no effort to date to clean up the pollution they created.  Further, TESPA seeks forward looking injunctive relief to prevent a similar event from occurring which may adversely impact members such as prohibiting the use of drilling or boring practices which may again release more drilling fluid that may impact the water supply to its members.  As such, TESPA has "associational standing" to participate in this action.

192.    An association has standing to bring suit on behalf of its members when (1) its members would otherwise have standing to sue in their own right, (2) the interests it seeks to protect are germane to the organization's purpose, and (3) neither the claim asserted nor the relief requested requires the participation in the lawsuit of each of the individual members. *Hunt v. Wash. State Apple Adver. Comm'n,* 432 U.S. 333, 343 (1977); *Tex. Ass'n of Bus.,* 852 S.W.2d 440, 447 (Tex. 1993).

193.    Just this month, June, 2020, the Supreme Court of the United States restated the rule as, "An association may file suit 'to redress its members' injuries, even without a showing of injury to the association itself.' (citation omitted) All Article III requires is that a member 'would otherwise have standing to sue in their own right' and that 'the interests [the association] seeks to protect are germane to the organization's purpose.' "  *Thole v. U. S. Bank N.A,* — U.S. —, 2020 WL 2814294, at *15 (June 1, 2020).  TESPA handily meets the *Thole* standard.  Besides meeting

this simpler *Thole* standard, TESPA also meets the older three prong test and offers a summary of that standard here to quiet any possible question.

194.     Applying the same three prong test, the Austin Court of Appeals found that a similar group seeking to protect water quality, the Save Our Springs Alliance, met the requirement for associational standing trying to protect water quality that impacted its members.   "The SOS Alliance's petition alleges that its members are residents of Travis and Hays counties who are concerned with water quality in the Edwards Aquifer and Barton Springs Watershed. Under *Groves,* individual members living in the affected area have standing to sue. The interest that the SOS Alliance seeks to protect by this suit—water quality in the Edwards Aquifer and Barton Springs Watershed—unquestionably reflects the organization's expressed purpose."   *Save Our Springs Alliance, Inc. v. Lowry*, 934 S.W.2d 161, 163 (Tex. App. 1996)(orig. proceeding)(internal citation omitted).

**The First Prong: The Members of TESPA Have Standing to Sue in Their Own Right**

195.     The association must show that its members "have standing to sue in their own right". *Tex. Ass'n of Bus.,* 852 S.W.2d at 447 explains that the first prong of the associational standing test "should not be interpreted to impose unreasonable obstacles to associational representation.... [T]he purpose of [the first prong] is simply to weed out plaintiffs who try to bring cases, which could not otherwise be brought, by manufacturing allegations of standing that lack any real foundation."

196.     Associational standing is not based on an association's direct, independent standing; it is derived from the standing of the individual members of the association. *See Warth v. Seldin,* 422 U.S. 490 (1975)(explaining that "[e]ven in the absence of injury to itself, an association may have standing solely as the representative of its members"); *see also, Hunt,* 432 at 340 – 42 (rejecting

contention that the association lacked standing because challenged statute had no impact on the association—the Washington State Apple Advertising Commission—but only upon Washington apple growers and dealers).  To hold that only an association directly aggrieved possesses standing is inconsistent with the concept of associational standing articulated by the United States Supreme Court. *See, Hunt* 432 U.S. at 340.  The fact that the association does not possess direct, independent standing is not relevant to a determination of associational standing so long as the three prongs of the associational standing test are met. *See id.*

**Second Prong:  The interests it seeks to protect are germane to the organization's purpose.**

197.    This action is well within the express purposes of TESPA.  The Certificate of Formation contains TESPA's stated purpose. "Section 5.01. The Corporation is organized exclusively for charitable and educational purposes as defined in Section 501(c)(3) of the Internal Revenue Code, including, but not limited to, research, development and publication of proposals to protect the health of the Trinity Aquifer, Edwards Aquifer, their groundwater, and Hill Country artesian springs including the San Marcos Springs in San Marcos, Texas.  These activities include monitoring and protecting endangered and threatened species in the San Marcos Springs and other Hill Country artesian springs; increasing public awareness and understanding of environmental issues in and around Hill Country artesian springs including the San Marcos Springs, such as the hydrologic connectivity of the Trinity Aquifer system and the Edwards Aquifer system via geologic faulting, through media and other educational programs; participating in common law or statutory based litigation designed to further these activities; researching and publishing information about these issues to inform the public; and reviewing and commenting upon existing practices which may or do impact these issues."

**Third Prong:   (3) neither the claim asserted nor the relief requested requires the participation in the lawsuit of each of the individual members.**

198.     In this action, homeowners impacted by the water pollution are parties seeking damages. TESPA seeks injunctive relief, especially on a larger geographic scale, which does not require its other members, in accordance with its mission statement to protect the water in this area.  *See Tex. Ass'n of Bus.,* 852 S.W.2d at 448 (recognizing associational standing under third prong when association sought only prospective relief and did not need to prove the individual circumstances of its members to obtain that relief); *see also Hunt,* 432 U.S. at 343–44.

199.     TESPA does not seek damages for itself or its members, but in the alternative to, or in addition depending on the injunctive relief crafted by the Court, TESPA seeks penalties payable to the federal government, which is permitted for a non-profit public interest group in a "citizen suit."  The penalties are warranted and recoverable as the Defendants have made no effort to clean up the pollution they created.  TESPA seeks relief on a larger scale for the plume that remains in the aquifer uncontained and unremediated like a modern day remake of "The Blob" meandering about drifting towards unsuspecting wells of other members and public water intakes.

200.     Defendants' disregard for public water sources certainly warrants severe punishment appropriate to impose a "sting" on a multi-billion construction project to motivate it to clean up the mess it made and to serve as a deterrent to assure protection of water quality in the future.

201.     Thus, TESPA has "associational standing" to bring this action.

## RELIEF REQUESTED

202.     Plaintiffs seek a declaration that Defendants violated the Safe Drinking Water Act.

203.     Plaintiffs seek penalties under the Safe Drinking Water Act wholly payable to the United States government.    The Court should impose the maximum penalties of $57,317 per day of

violation under the Safe Drinking Water Act and all other available penalty and punishment provisions available.

204.    The homeowner Plaintiffs seek damages under the state law causes of action for:

> (1) reduced property value;
>
> (2) damages to the "water estate," which is property recognized in *Edwards Aquifer Auth. v. Day,* 369 S.W.3d 814, 830 (Tex. 2012) as property separate from the surface estate, just as the mineral estate is separate from the surface estate;
>
> (3) damages for unreasonable discomfort or annoyance to persons of ordinary sensibilities attempting to use and enjoy their property under the nuisance cause of action; and,
>
> (4) pre-judgment and post-judgment interest.

205.    All Plaintiffs seek reasonable and necessary attorneys' fees, expert witness fees, and costs, including fees and costs through appeals to the Fifth Circuit and Supreme Court of the United States, if appeals are taken, as allowed by 42 U.S.C. § 300j-8(d).

## **INJUNCTIVE RELIEF**

206.    There is no adequate remedy at law for Plaintiffs to clean up the pollution Defendants have decided to leave in place other than perhaps leaving taxpayers with the burden under CERCLA. Thus, Plaintiffs request the Court to use its injunctive powers to assess the feasibility of clean up and issue orders for cleanup of the contamination as determined by feasibility analysis.

207.    The plume presents an ongoing risk of contamination to other area drinking water wells and supplies if not remediated.

208.    Injunctive relief is sought to require Defendants to use construction methods that will not cause further contamination of the underground sources of drinking water through the future use

of drilling fluid in construction or operations in this area.  Defendants are already using "dry" boring methods in this zone from Blanco to Wimberley to Kyle, so they certainly are capable of doing without drilling fluid for their construction activities in this area.

209.    Plaintiffs request an injunction prohibiting the use of ALL similar fluids.  Plaintiffs request the Court to take judicial notice of the Biological Opinion issued by the United States Fish & Wildlife Service[19] which prohibits how equipment is filled with gas, diesel, or oil to protect water resources.  Surely, the use of 10's of 1,000's of gallons of drilling fluid should also be included in the standards imposed by the USFWS Biological Opinion.

210.    Damages and even the ostensibly substantial penalties under the Safe Drinking Water Act are of little to no consequence to this behemoth multi-billion project and the conglomerate in charge of building it and later operating it moving millions of dollars of product per day through it.

211.    Thus, there is "no adequate remedy at law," and the Court sitting in equity needs to exercise its powers to protect the public from future threats and dangers to the public water supply posed by the conduct of Defendants.

212.    The Court should also consider that besides this incident of injecting 36,000 gallons of drilling fluid in the drinking water and making no attempt to clean it up, Defendants have cut a water supply line owned by SAWS,[20] the San Antonio Water System, and shockingly, lost a box with radioactive material in the Pedernales River, which was recovered 13 miles downstream.[21]

---

[19] See, City of Austin, et al. v. Permian Highway Pipeline, et al. already pending in this district and before the Court to consider issues arising from enforcement of the Endangered Species Act.
[20] https://haysfreepress.com/2020/05/27/kinder-morgan-pipeline-ruptures-saws-water-project/

[21] https://www.kxan.com/news/texas/camera-with-radioactive-material-missing-after-truck-swept-away-in-pedernales-river-floodwaters/

The Court should consider that Defendants are displaying a pattern of wanton and reckless conduct endangering and posing real threats and dangers to drinking water supplies in this area. Thus, Plaintiffs respectfully request the Court to protect the community from the dangers to the drinking water supply.

213.   Drilling in the geological region of the Blanco River Valley, Cypress Creek Watershed, and Wimberley Valley above Jacob's Well, where the route of the PHP pipeline is set to go is inherently rife with the potential for further events of this type to the point that some hydrogeologists see a recurrence of this pollution event to be a near certainty as this activity marches onward towards Wimberley, unless substantially changed and improved management practices are implemented.

214.   These parties ask the Court to craft injunctive relief after hearing from expert witnesses and parties on how to protect this sole source of drinking water on which an estimated 10,000 people depend in the immediate Blanco River valley from Blanco to Wimberley to Kyle, and up to two million people in the Edwards Aquifer area.

215.   Plaintiffs request the Court to halt further construction of this pipeline between Kyle and Blanco and requests that Kinder Morgan work with the Court, TESPA and its hydrogeologists to find an alternative route that does not involve this type of risk to sole source aquifers and water supply reservoir for an even broader array of municipalities, or develop substantially improved construction and future operation "best management practices" that will protect the water quality in this incredibly sensitive region.

216.   As the plume contains seven or more Class 1 human carcinogens and also causes persistent excessive turbidity, the plume presents an "*endangerment*" that is "*imminent and substantial*" as

41

provided in the 2018 EPA updated policy guidance paper to assist with consistency of enforcement of the Safe Drinking Water Act.[22]

217.    Quoting from the EPA's 2018 Updated Guidance on Emergency Authority[23] – Remedial Actions may include:

- issuing orders as necessary to protect the health of persons who are or may be users of such system (including travelers), including orders that require:

- -  the provision of alternative water supplies, at no cost to the consumer, by persons who caused or contributed to the endangerment (e.g., provision of bottled water, installing and maintaining treatment, drilling of new well(s), connecting to an existing PWS).
- -  information about actual or impending emergencies (e.g., if standard information gathering tools like SDWA Section 1445 would not result in an expeditious response or may not apply in a certain case).
- -  public notification of hazards (e.g., door-to-door, posting, newspapers, electronic media).
- -  an investigation to determine the nature and extent of the contamination in the environment.
- -  a survey to identify PWSs, private supply wells or ground water monitoring[40]
- -  monitoring of regulated or unregulated potential or identified contaminants.
- -  development of a feasibility study to assess potential remedial actions to abate an endangerment.
- -  an engineering study proposing a remedy to eliminate the endangerment and a timetable for its implementation.

- -  control of the source of contaminants that may be contributing to the endangerment, including by halting disposal.
- -  cleanup of contaminated soils endangering an USDW.

• commencing a civil action for appropriate relief including a restraining order, or a temporary or permanent injunction. The injunction may require the PWS owner or operator, UIC well owner or operator, or the responsible party to take steps to abate the hazard.

---

[22] https://www.epa.gov/sites/production/files/2018-09/documents/updatedguidanceonemergencyauthorityundersection1431sdwa.pdf

[23] https://www.epa.gov/sites/production/files/2018-09/documents/updatedguidanceonemergencyauthorityundersection1431sdwa.pdf

218.   Some additional specific requests for injunctive relief:

- an injunction requiring Kinder Morgan, PHP, and all other responsible parties, to immediately cease operations and implement appropriate steps to prevent the ongoing illegal discharges of fluids, pollutants and contaminants into underground sources of drinking water, waters of the United States, and the environment;

- an injunction requiring Kinder Morgan, PHP, and all other responsible parties, to immediately remove and remediate the fluids, pollutants and contaminants that have been discharged into underground sources of drinking water, waters of the United States, and the environment;

- penalties or fines appropriate under the applicable federal statutes to be paid to the federal government, which range up to $57,317 per violation, per day depending on the statute;

- and, all other relief to which Plaintiffs may show themselves entitled under the law and evidence, and as the Court may deem just.

Respectfully submitted,

THE MUNDY FIRM, PLLC

Jeffery Mundy
Texas Bar No. 14665575
4131 Spicewood Springs Rd
Ste. O-3
Austin, Texas 78759
(512) 334-4300
jeff@jmundy.com

**ATTORNEY FOR PLAINTIFFS**


James B. "Jim" Blackburn
Texas Bar Number 02388500
Blackburn & Carter, P.C.
4709 Austin St.
Austin, TX 77004
713-524-1012  office

**ATTORNEYS FOR PLAINTIFFS**

Charles Irvine
Texas Bar Number 24055716
Irvine & Conner PLLC
4709 Austin St.
Houston, Texas 77004
713-524-1012  office
713-269-9370  cell
713-524-5165  fax
charles@irvineconner.com

**ATTORNEY FOR TESPA**